FILED
United States Court of Appeals
Tenth Circuit

April 4, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

CHARLES EDWARD WEIMER,

     Petitioner - Appellant,

v.

JOE ALLBAUGH,

     Respondent - Appellee.

No. 18-6072
(D.C. No. 5:17-CV-00079-M)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.
_____

     In 2014, an Oklahoma jury convicted Charles Edward Weimer of first-degree

murder (child abuse) and fixed his sentence at life imprisonment.  On appeal to the

Oklahoma Court of Criminal Appeals ("OCCA"), Mr. Weimer raised several

contentions of error, including (1) the violation of his Sixth Amendment right to

confront and cross-examine two of the State's witnesses and present a complete

defense, (2) the admission into evidence of two graphic autopsy photographs that

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
submitted without oral argument.  This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel.  It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

were so unduly prejudicial that it rendered his trial fundamentally unfair, and (3) cumulative error. The OCCA affirmed the conviction and sentence.

Mr. Weimer then sought a writ of habeas corpus in federal court under 28 U.S.C. § 2254, raising the three errors described above. The magistrate judge issued a report and recommendation to deny relief and the district court adopted the report and recommendation. Nonetheless, the court issued Mr. Weimer a Certificate of Appealability ("COA") on all three issues. Mr. Weimer now appeals, raising the three issues for which the court granted the COA. We affirm the denial of habeas relief.

## I. BACKGROUND

### A. The Trial

The facts in the magistrate judge's report and recommendation are based on the state-court record.[1] At the time of his death, two-year-old J.P.G. was living with his mother, Courtney Ward, and her boyfriend, Mr. Weimer. The day that J.P.G. died, he was with Mr. Weimer at the apartment where the couple lived. That afternoon, Ms. Ward received a telephone call at work from her mother who told her that J.P.G. had fallen down some stairs. Ms. Ward called Mr. Weimer who confirmed that J.P.G. had indeed taken a fall. Mr. Weimer told her that he had J.P.G. in the car and was on his way to pick her up from work. Subsequently, Mr. Weimer picked up Ms. Ward and, together, they took J.P.G. to the hospital.

---

[1] The OCCA issued a summary opinion that contained no factual findings.

2

Ms. Ward told the hospital staff that J.P.G. had been injured in a fall. That evening, J.P.G. died from his injuries.

In a subsequent police interview, Mr. Weimer denied striking or otherwise injuring J.P.G. Instead, he explained that he was not paying attention when they were leaving the apartment and J.P.G. fell down the iron steps outside the apartment. According to the detective assigned to the case, there was no physical evidence at the scene to prove what happened either way. But following the autopsy report that stated the cause of death was a homicide, Mr. Weimer was charged with first-degree murder.

Inas Yacoub, M.D., a forensic pathologist at the Office of the Chief Medical Examiner ("OCME"), who performed the autopsy, testified for the State. According to Dr. Yacoub, the cause of J.P.G.'s death was blunt force trauma to the abdomen—a blow from a fist. She further testified that J.P.G. suffered acute blunt force trauma to the back, top, and front of his head. In order to assess the head injuries, Dr. Yacoub had to examine J.P.G.'s skull, which required pulling back his scalp.

To help Dr. Yacoub demonstrate J.P.G.'s head injuries to the jury, the State moved the admission of Exhibits 38 and 39, which showed the bleeding and bruising on J.P.G.'s skull. The trial court overruled Mr. Weimer's objection to Exhibits 38 and 39, which Mr. Weimer describes as "ghastly . . . photographs depicting how [Dr. Yacoub] had reflected [J.P.G.'s] scalp . . . down to the chin to expose the bare skull." Aplt. Opening Br. at 14; *see id.* at 34 (clarifying that to "reflect" the scalp means "to pull back" the scalp). The court also overruled Mr. Weimer's objection

3

that Exhibits 38 and 39 be included in the exhibits that the jury had during its deliberations.

The State also called John Stuemky, M.D., a physician in the child abuse unit at Children's Hospital. Dr. Stuemky reviewed Dr. Yacoub's report and the police reports and agreed that the cause of death was an abdominal injury. He further opined that J.P.G.'s injuries, as seen in the autopsy photographs and explained in Dr. Yacoub's report, were consistent with physical abuse—not a fall.

For his part, Mr. Weimer presented the expert testimony of Thomas Young, M.D., a forensic pathologist and the Chief Medical Examiner of Jackson County, Missouri. Dr. Young reviewed Dr. Yacoub's report, the police files, and visited the apartment where the couple lived. According to Dr. Young, J.P.G.'s abdominal and head injuries could have been caused by a fall down the stairs by striking the edge of the iron steps, and were therefore consistent with Mr. Weimer's account of a fall. Dr. Young specifically disagreed with Dr. Stuemky's testimony that children do not die from falling down steps, and he also contradicted Dr. Yacoub's conclusion that the cause of death was a homicide.

At trial, Mr. Weimer attempted to discredit Dr. Yacoub's opinion not only with Dr. Young's testimony, but through evidence that the OCME had lost its national accreditation due to mismanagement and incompetence. Specifically, Mr. Weimer argued that the autopsy report was inadmissible under Oklahoma law because the facility was unaccredited. *See* Okla. Stat. tit. 74, § 150.37. Although the State acknowledged that the facility was unaccredited, it would not stipulate to that

4

fact on the record. As a result, Mr. Weimer sought to call Kari Learned, the

Executive Secretary of the OCME, to testify to the lack of accreditation.

The evidence presented by Mr. Weimer outside the presence of the jury

established that the OCME lost its accreditation in 2009 for several reasons;

however, none of those reasons related to Dr. Yacoub's qualifications or the quality

of her work. As such, the trial court excluded Ms. Learned's testimony as irrelevant,

but ruled that Mr. Weimer would be allowed latitude in his cross examination to

explore any relevant deficiencies: "I find the issue of accreditation to be irrelevant,

but that does not tie defense hands in *any other issues* that you may feel may be

relevant and credible by way of what [the OCME] may or may not have done

properly or improperly." Aplt. Amended App. at 77 (emphasis added) (brackets and

internal quotation marks omitted). "I will once again reiterate that . . . . I am not

tying your hands and I absolutely expect defense counsel to cross-examine each of

the State's expert witnesses as to any deficiencies they may have performed." *Id*.

(internal quotation marks omitted).

## B. The OCCA Proceedings

On appeal to the OCCA, Mr. Weimer argued that the trial court's decision to

exclude the evidence concerning the lack of accreditation violated his Sixth

Amendment rights. The OCCA rejected this claim:

> The trial court's ruling prohibiting defense counsel from introducing
> evidence that the Medical Examiner's office was not accredited based upon
> relevancy denied Weimer neither his right to present a defense nor his right
> to confrontation. *See Gore v. State*, 2005 OK CR 14 ¶ 21, 119 P.3d 1268,
> 1275 (in the exercise of the right to present a defense the accused must

comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence); *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435, 89 L.Ed. 2d 674 (while the Confrontation Clause guarantees an opportunity for effective cross-examination, it does not preclude the trial court from imposing reasonable limitations on cross-examination such as cross-examination into issues which would confuse the jury or those that are only marginally relevant).

*Id*. at 78 (internal quotation marks omitted).

As to Exhibits 38 and 39, two of several autopsy photographs introduced at trial, Mr. Weimer argued that the probative value of the photographs was outweighed by their prejudice and rendered his trial fundamentally unfair. Although Mr. Weimer asserted this claim as a violation of his Constitutional rights, the OCCA, citing two OCCA cases, limited its review to whether there was a violation of state law: "We find no abuse of discretion in the trial court's decision to admit the two autopsy photographs at issue because they were relevant and their probative value was not substantially outweighed by the danger of unfair prejudice." *Id*. at 82 (internal quotation marks omitted).

The OCCA also denied Mr. Weimer's claim of cumulative error because it found no errors, individually or cumulatively, that merited relief.

## C. The District Court Habeas Proceedings

The district court denied habeas relief. First, the court held that the OCCA's determination that there was no Sixth Amendment violation was consistent with Supreme Court precedent because the trial court's ruling to disallow evidence regarding accreditation was reasonable and provided an opportunity for Mr. Weimer

6

to cross-examine the State's witnesses. Second, the court determined, on de novo review, that the trial court's decision to allow the State to introduce the contested autopsy photographs—Exhibits 38 and 39—did not render Mr. Weimer's trial fundamentally unfair. Last, the court concluded that the OCCA's decision on Mr. Weimer's claim of cumulative error was not unreasonable or contrary to clearly established federal law because "no errors, harmless or otherwise, exist." *Id*. at 86.

## II. STANDARD OF REVIEW

"Our review of a state prisoner's petition for a writ of habeas corpus is circumscribed by the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA')." *Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011); *see also* 28 U.S.C. § 2254. "Under AEDPA, the standard of review applicable to a particular claim depends on how that claim was resolved by the state courts." *Byrd*, 645 F.3d at 1165.

For example, because the state court adjudicated Mr. Weimer's Sixth Amendment claim "on the merits, we may only grant relief if the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" or "'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id*. (quoting § 2254(d)(1), (2)).

Our first inquiry is "whether the principle of federal law invoked by the petitioner was clearly established by the Supreme Court at the time of the state court judgment. If so, [we] inquire[] whether the state court decision was contrary to or

7

involved an unreasonable application of that clearly established federal law." *Byrd*, 645 F.3d at 1165 (citation and internal quotation marks omitted).

"A state court decision is contrary to the Supreme Court's clearly established precedent if the state court applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts." *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) (brackets and internal quotation marks omitted). "[W]hether a rule application was unreasonable requires considering the rule's specificity. The more general the rule . . . the more leeway state courts have in reaching outcomes in case-by-case determinations. An *unreasonable* application of federal law is therefore different from an *incorrect* application of federal law." *Id.* (brackets, citation, and internal quotation marks omitted). Thus, "in order for this court to grant relief, we must be convinced that the application was . . . objectively unreasonable." *Byrd*, 645 F.3d at 1166 (internal quotation marks omitted).

The standard of review for Mr. Weimer's claim that the introduction of Exhibits 38 and 39 rendered his trial fundamentally unfair is different because the OCCA did not adjudicate the merits of this federal claim. "In such situations, § 2254(d)'s deferential standards of review do not apply. For [this] claim[], we review the district court's legal conclusion[] *de novo* and its factual findings for clear error." *Id.* at 1166-67 (citations, footnote, and internal quotation marks omitted). Where, as here, "the district court based its factual findings entirely on the state court

8

record, we review that record independently." *Id*. at 1167 (internal quotation marks omitted).

### III. DISCUSSION

### A. The Sixth Amendment

We review Mr. Weimer's Sixth Amendment claim under two Supreme Court cases: (1) *Holmes v. South Carolina*, 547 U.S. 319 (2006), and (2) *Delaware v. Van Arsdall*, 475 U.S. 673 (1986).

In *Holmes*, the Supreme Court recognized that the Constitution guarantees a criminal defendant a meaningful right to present a complete defense: "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." 475 U.S. at 324 (internal quotation marks omitted). As such, a state cannot exclude evidence by "rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id*. (brackets and internal quotation marks omitted). In *Van Arsdall*, the Court recognized that the "main and essential purpose" of the Sixth Amendment's Confrontation Clause "is to secure for the opponent the opportunity of cross-examination." 475 U.S. at 678 (emphasis and internal quotation marks omitted). Still, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the

witness' safety, or interrogation that is repetitive or only marginally relevant." *Id*. at 679. The right to confrontation affords the "*opportunity* for effective cross-examination"—it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id*. (internal quotation marks omitted).

As his principal argument, Mr. Weimer relies on *Myers v. State*, 133 P.3d 312, 326 (Okla. Crim. App. 2006), *overruled on other grounds, Davis v. State*, 419 P.3d 271, 281, n.3 (Okla. Crim. App. 2018), in which the trial court allowed the defendant to cross-examine a witness from the Oklahoma State Bureau of Investigation concerning the agency's ongoing efforts to have its DNA Unit certified by the American Society of Crime Lab Directors. According to Mr. Weimer, he is entitled to habeas relief on the grounds that the "legal ruling of the trial court that the lack of national accreditation was not relevant, is contradicted by a published opinion of the OCCA—which both the trial court and the OCCA ignored." Aplt. Opening Br. at 22. But the issue in *Myers* was different. After the defendant attacked the reliability of the State's "DNA test results, the accreditation of the lab, and the qualifications of [the] chemist" who performed the test, the State offered "expert testimony regarding the testing procedures utilized by the lab, [the expert's] knowledge of the accreditation process, and the qualifications of the lab and [the chemist's] qualifications." 133 P.3d at 326. The issue on appeal was not whether accreditation evidence was properly admitted in the first instance; rather, the issue was whether the trial court abused its discretion in allowing the State's expert to testify. The OCCA

held that there was no abuse of discretion under Oklahoma law. More importantly, "any purported inconsistency in the OCCA's *own (state law) precedent* produced by the OCCA's ruling in [Mr. Weimer's] case is [not] germane to our inquiry under AEDPA—where the unalloyed legal concern is clearly established *federal* law." *Grant v. Royal*, 886 F.3d 874, 947 n.25 (10th Cir. 2018), *cert denied*, *Grant v. Carpenter*, 2019 WL 177713 (2019).

Furthermore, as the State points out, Mr. Weimer was able to cross-examine Drs. Yacoub and Stuemky "regarding any deficiencies in their work or facilities, or anything [Mr. Weimer] felt they may have done improperly." Aplee. Answer Br. at 31. The only thing that Mr. Weimer could not do was ask whether the OCME was unaccredited, which the trial court ruled was irrelevant and would lead to confusion.

Because Mr. Weimer was afforded an opportunity for effective cross-examination and to present a complete defense, we conclude that the OCCA's disposition of Mr. Weimer's Sixth Amendment claims was not contrary to, nor did it involve an unreasonable application of, clearly established federal law.

## B. Introduction of Exhibits 38 and 39

According to Mr. Weimer, the trial court's decision admitting Exhibits 38 and 39—the autopsy photographs showing the injuries to J.P.G.'s head—denied him the right to a fundamentally fair trial.[2] Because the OCCA did not rule on the merits of

---

[2] Mr. Weimer also argues that the jury should not have had "unguided and unlimited access" to Exhibits 38 and 39 during deliberations. Aplt. Opening Br. at 30. However, Mr. Weimer cites no authority that it is unconstitutional for the jury to

this federal claim, our review is de novo.  Moreover, because the district court based

its factual findings on the state court record, we review that record independently.

"Federal habeas review is not available to correct state law evidentiary errors;

rather it is limited to violations of constitutional rights." *Spears v. Mullin*, 343 F.3d

1215, 1225 (10th Cir. 2003).  "When, as here, [a] habeas petitioner[] challenge[s] the

admission of photographic evidence as violative of the Constitution, this court

considers whether the admission of evidence so infected the [trial] with unfairness as

to [violate] due process." *Id*. at 1226 (ellipses and internal quotation marks omitted).

"The essence of our inquiry . . . is whether the admission of the photographs rendered

the proceedings fundamentally unfair." *Smallwood v. Gibson*, 191 F.3d 1257, 1275

(10th Cir. 1999).

At Mr. Weimer's trial, the State was attempting to prove that J.P.G. died from

abuse—not an accidental fall—and Exhibits 38 and 39 were relevant to establish the

nature of the trauma to J.P.G.'s head.  Also, the photographs assisted Dr. Yacoub in

her description of the injuries and locations and sizes of the contusions, which could

not be seen with the naked eye.  They also assisted Dr. Stuemky in his testimony that

J.P.G.'s injuries were inconsistent with a fall down the stairs.

We have reviewed Exhibits 38 and 39, and agree with Mr. Weimer that they

are graphic.  However, in the context of this case and the hotly contested issue

whether J.P.G.'s head injuries were caused by an accidental fall or inflicted by

---

have access to properly admitted evidence during deliberations.  Therefore, we
summarily reject this argument.

12

Mr. Weimer, we cannot say that the admission of Exhibits 38 and 39 denied Mr. Weimer his constitutional right to a fair trial. Therefore, we deny his habeas claim.

## C. Cumulative Error

For his final claim, Mr. Weimer contends that the cumulative effect of the foregoing constitutional errors warrants federal habeas relief. Our analysis is brief, because "[a]s the term 'cumulative' suggests, we undertake a cumulative-error analysis only if there are at least two errors." *Lott v. Trammell*, 705 F.3d 1167, 1223 (10th Cir. 2013) (ellipsis and internal quotation marks omitted). Here there are no errors, and Mr. Weimer's claim for habeas relief fails.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Mr. Weimer's habeas petition.

Entered for the Court


Jerome A. Holmes
Circuit Judge